

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00325-CR

———————————————

JAY ROTTER, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. F20-2507-431

---

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

The State charged Appellant Jay Rotter with the murder of his girlfriend, Leslie Hartman. *See* Tex. Penal Code Ann. § 19.02. A jury found Rotter guilty and assessed his punishment at 30 years' confinement, and the trial court sentenced him accordingly.

On appeal, Rotter raises three points, arguing that the trial court erred by (1) denying his motion to suppress evidence obtained during a search because the search-warrant affidavit was allegedly invalid, (2) failing to suppress his statements after he requested a lawyer, and (3) failing to grant a mistrial after sustaining an objection to one of the State's questions to a trial witness. We affirm.

## I. Factual and Procedural Background

Rotter and Hartman met online, and they quickly moved in together in May of 2020. Rotter worked in the narcotics unit of the Tarrant County Sheriff's Office. Hartman, who was paralyzed and confined to a wheelchair, worked from her home studio as an artist.

One of Hartman's quirky art projects was what she called the "milk bomb." She had left a half gallon of milk in her backyard to see if it would explode.

On August 26, 2020, Rotter posted about the "milk bomb" on the online chat site Discord. Minutes before 11 p.m., Rotter posted "SHOULD I GO SHOOT THIS FUCKING[ ]BOTTLE OF M IN THE BACK[?]" Shortly after, he posted on

2

Discord, "[I] killed that milk bomb"; "I went into the yard and merked that milk."[1] Then, Rotter took a photo of himself holding his handgun in front of his computer and posted it on Discord.

Rotter posted again at 11:13:14 p.m., "I TOLD HER. LISTEN. ONE SHOT ONLY. THEY CALL IT IN AFTER AND THEY CAN." Thirty-six seconds later, Rotter posted, "[I] just s," "[I] just sent a 9 millie," "[I] just sent a 9 millie in this fuckin hippy." Around twenty minutes later, Rotter called 911 and stated that Hartman had shot herself.[2]

When the police arrived, Rotter's left side was saturated in blood. He initially claimed that his gun had been in a storage bin and that, while he was distracted, Hartman had quickly located the gun and shot herself while hugging him. Rotter described it as a "three-second situation."

The first responding officers questioned him at the scene. During the questioning, Rotter stated that he would like to speak with his lawyer and then said "no further questions." An officer continued questioning him.

Detectives later arrived and asked whether Rotter would make a statement at the police station, and he agreed and sat for an interview. During that interview,

---

[1]Urban Dictionary states that merk means: (1) to kill someone, (2) to beat someone in a game, (3) to insult someone, or (4) to injure someone. *See Merk*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=merk (last visited March 25, 2025.

[2]A neighbor's doorbell camera picked up the sounds from both gun shots.

among other things, Rotter never mentioned shooting the milk bomb, could not recall hugging Hartman during the shooting, and maintained that she had shot herself.

When the interviewing detectives asked if they could download Rotter's phone, Rotter refused. The detectives left the room, and as video shows, Rotter began manipulating his phone. When the detectives returned, they asked for Rotter's phone and password. Although he handed over his phone, he again refused to consent to a search. Later analysis revealed that Rotter had reset his phone to its factory-default settings, erasing everything on it.

The police obtained search warrants for Hartman's home and gathered additional evidence. Upon collecting and analyzing the evidence, the police determined that Rotter's story did not line up with it: Rotter's left side was blood soaked; Hartman's gunshot wound was on the right side of her head; the bin where Rotter's gun was stored was closed, not open, and would have been hard to access from Hartman's wheelchair; the firearm was located under a blanket; and the gun holster was located on a bed. Additionally, police found gunshot residue on Rotter's hands but not on Hartman's hands. Unlike Rotter, Hartman had no prior experience with handguns. And although Rotter claimed that Hartman had talked of suicide, she was not suicidal on the date of her death.

Before trial, Rotter filed two broadly worded motions to suppress. In one motion, Rotter argued that the police obtained evidence unlawfully because the search-warrant affidavit did not show probable cause that a crime had been

4

committed. In the other motion, Rotter sought to suppress his own oral, audio, and videotaped statements that he claimed were obtained illegally. The trial court considered and denied both motions.

The State later tried its case to a jury and presented evidence that Rotter, a peace officer, had shot Hartman in the head with his duty weapon. Rotter maintained that Hartman had died by suicide. Ultimately, the jury found Rotter guilty of murder.

## II. Rotter's Suppression Issues

Rotter complains in two points that the trial court erred by denying his motions to suppress evidence. First, he complains about a search warrant, and second, he complains about statements he made to police after he had requested a lawyer. As we explain below, the trial court did not err in denying Rotter's suppression motions.

### A. The search warrant

In his first point, Rotter argues that the trial court should have suppressed evidence obtained through a search warrant because the search-warrant affidavit (1) did not show probable cause that a crime had been committed and (2) contained false information. We disagree with both subpoints.

#### 1. Standard of review and probable cause in search-warrant affidavits

Ordinarily, we apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). But when reviewing a magistrate's decision to issue a warrant, we apply a highly deferential standard of review because of the constitutional preference for searches

5

conducted pursuant to a warrant over warrantless searches. *State v. McLain*, 337 S.W.3d 268, 271–72 (Tex. Crim. App. 2011). Under the Fourth Amendment, an affidavit supporting a search warrant is sufficient if, from the totality of the circumstances reflected in the affidavit and the reasonable inferences it supports, the magistrate was provided with a substantial basis for concluding that probable cause existed. *Swearingen v. State*, 143 S.W.3d 808, 811 (Tex. Crim. App. 2004). A defendant seeking suppression of evidence obtained pursuant to a search warrant must prove by a preponderance that the evidence was obtained in violation of the Fourth Amendment. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005); *State v. Huynh*, 683 S.W.3d 803, 814 (Tex. App.—Houston [1st Dist.] 2023, no pet.).

Our duty is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *State v. Jordan*, 342 S.W.3d 565, 569 (Tex. Crim. App. 2011). Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular location. *State v. Baldwin*, 664 S.W.3d 122, 130 (Tex. Crim. App. 2022). We give great deference to a magistrate's probable-cause determination, including a magistrate's implicit findings. *McLain*, 337 S.W.3d at 271–72.

When ruling on a motion to suppress evidence obtained pursuant to a search warrant, a trial court is limited to the four corners of the warrant and affidavit supporting the warrant. *Id.* at 271. We interpret the affidavit in a commonsensical and realistic manner, recognizing that the magistrate may draw reasonable inferences, and

6

when in doubt, we defer to all reasonable inferences that the magistrate could have made. *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013). Where, as here, the trial court did not enter findings of fact, we must uphold the trial court's ruling on any theory of law applicable to the case and presume the court made implicit findings in support of its ruling if the record supports those findings. *See State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000).

### 2. Standard of review and *Franks v. Delaware*

In *Franks v. Delaware*, the United States Supreme Court held that defendants may attack the truthfulness of factual statements made in a search-warrant affidavit. 438 U.S. 154, 171, 98 S. Ct. 2674, 2684 (1978); *see Diaz v. State*, 632 S.W.3d 889, 892 (Tex. Crim. App. 2021). Such a challenge requires the defendant to show by a preponderance of the evidence a material misstatement that was made intentionally or knowingly or with reckless disregard for the truth. *Diaz*, 632 S.W.3d at 892. A false statement is material if it is necessary to the finding of probable cause. *Id.*; *see Franks*, 438 U.S. at 156, 98 S. Ct. at 2676.

To obtain an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. *Franks*, 438 U.S. at 171, 98 S. Ct. at 2684. He must point out specifically the portion of the warrant affidavit that is claimed to be false and provide a statement of supporting reasons. *Id.* Allegations of negligence or innocent mistake are insufficient.

7

*Id.* In making a showing of falsity, the defendant is not limited to the four corners of the affidavit. *Cates v. State*, 120 S.W.3d 352, 355 n.3 (Tex. Crim. App. 2003).

We review the trial court's ruling on a *Franks* issue under the same standard applied to search-and-seizure issues generally. *See Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); *Fenoglio v. State*, 252 S.W.3d 468, 472–73 (Tex. App.—Fort Worth 2008, pet. ref'd). We give almost total deference to the court's rulings on questions of historical fact and mixed questions of law and facts that turn on an evaluation of credibility and demeanor, but we review de novo the trial court's application of the law to those facts. *Id.*

**3. Analysis: The search-warrant affidavit was based on probable cause.**

Rotter argues that there was no probable cause for the search warrant. We disagree. From the four corners of Detective Tommy Potts's search-warrant affidavit, the magistrate could directly find the following facts: (1) Detective Potts was a detective in the Denton Police Department and was assigned to the Investigative Services Bureau-Major Crimes Unit; (2) Detective Potts was an experienced peace officer and had been involved in numerous other criminal investigations, including homicides; (3) on August 26, 2020, around 11:34 p.m., Rotter called 911 to report that his girlfriend, Hartman, had killed herself at 2409 Robinwood Lane, Denton, Texas; (4) during the 911 call, Rotter cried and cursed at the call taker; (5) Rotter told the call taker that he was a "cop" and that "he knows how this goes"; (6) officers made contact with Rotter on the scene; (7) officers found a deceased female in the

bedroom, located next to a wheelchair; (8) the female had an apparent gunshot wound to the side of her head; (9) investigative officers found stains that appeared to be blood on Rotter's body, as well as in a bathroom, living room, and hallway; (10) Rotter and Hartman both lived at the residence and were the only people inside during the shooting; and (11) two cars were in the driveway (one was registered to Rotter and another to Hartman's mother) that Detective Potts thought might contain items relevant to the homicide investigation.

Given these direct facts, the magistrate could also have made reasonable inferences, including the following: (1) as a "cop," Rotter owned and knew how to use a gun; (2) Hartman was the deceased female in the residence and had been using the wheelchair; (3) Hartman died by gunshot; and (4) because of the blood on Rotter, he was close to Hartman when she died and had tracked her blood through the house, down the hallway, and into the bathroom, where he had tried to clean himself. *See Bonds*, 403 S.W.3d at 873; *Flores v. State*, 319 S.W.3d 697, 703 (Tex. Crim App. 2010) (outlining reasonable inferences). In light of the direct evidence in Detective Potts's affidavit and the reasonable inferences the magistrate could have made from the direct evidence, we hold that the magistrate had a substantial basis for concluding that probable cause existed that a homicide had been committed in the Robinwood residence. *See Flores*, 319 S.W.3d at 703.[3]

---

[3]In support of his argument, Rotter cites *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407 (1963), and *Smith v. State*, 542 S.W.2d 420 (Tex. Crim. App. 1976). Both

**4. Analysis: Rotter did not show falsity in the search-warrant affidavit.**

As part of his first point, Rotter also complains that "the search warrant was obtained through untruths and was in fact, deceitful to the magistrate." Although Rotter did not raise this specific ground in his pretrial suppression motions, he raised the issue at trial during Detective Potts's testimony, and the trial court conducted a *Franks* hearing outside the jury's presence.

During the hearing, the trial court read into the record a portion of Detective Potts's trial testimony. In that testimony, Detective Potts testified that he wrote a search-warrant affidavit "to be able to go in and collect evidence of the scene." Detective Potts agreed with the prosecutor that he had used the word "homicide" in his affidavit and not the words "murder," "capital murder," "manslaughter," or "anything of that nature." The prosecutor asked why Detective Potts had used the word "homicide" in the search-warrant affidavit. Detective Potts responded,

> We use the word "homicide" in a lot of these that are -- could be questionable as to actually what happened at first glance, right? Because homicide is just -- it's a death of a person.
>
> There's no law for suicide, so I can't write a search warrant for suicide. So we generally, in our practice, we write it for homicide, present it to a judge, and then that gives us permission to go inside and do the investigation.

---

cases are distinguishable given that neither involved a warrant, unlike this case in which we are asked to review a search-warrant affidavit that was presented to a magistrate. *See Wong Sun*, 371 U.S. at 481, 83 S. Ct. at 414; *Smith*, 542 S.W.2d at 421.

Detective Potts also testified that unnatural deaths and especially those involving gunshot wounds are going to be investigated. Detective Potts further testified that he assisted with the search.

After reading this portion of testimony, the trial court asked Rotter's counsel if he had any questions of the witness. Rotter's counsel responded by arguing about what he thought Detective Potts meant in using the term "homicide," said he would "let the record stand on its own," and presented no other evidence in support of his *Franks* claim.

Rotter alleges that the affidavit's statement that the officers believed a homicide had occurred was false because "the officers had not yet determined if this was a suicide or homicide." But from the evidence presented during the *Franks* hearing, Rotter never established that Detective Potts did not believe that a homicide had occurred and had intentionally, knowingly, or recklessly made a false statement. Indeed, before the *Franks* hearing, the trial court heard evidence that several investigating officers had suspected that Hartman's death was a homicide and had so informed Detective Potts before he wrote the search-warrant affidavit.

And although Rotter argued that he did not think that when Detective Potts used the word "homicide" he believed he had probable cause for homicide, the probable-cause standard "does not demand certainty; it is met so long as there is a 'fair probability' that evidence of criminal activity will be found." *Thacker v. State*, No. 07-23-00368-CR, 2024 WL 3405900, at *3 (Tex. App.—Amarillo July 12, 2024,

11

no pet.) (mem. op., not designated for publication) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983)). In other words, Detective Potts need not have completely ruled out suicide or completely ruled in homicide. *See id.*; *see also United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999) ("[T]he requisite 'fair probability' is something more than a bare suspicion, but need not reach the fifty percent mark.").

Rotter failed to present any evidence pointing to the falsity of Detective Potts's statements concerning his belief that there was evidence of a homicide at Hartman's residence.[4] *See Diaz*, 632 S.W.3d at 895. Based on the record before us, giving deference as we must to the trial court's finding of no false evidence, we hold that the trial court did not err by denying Rotter's suppression motion. *See Johnson*, 68 S.W.3d at 652–53; *see also Shedden v. State*, 268 S.W.3d 717, 738 (Tex. App.—Corpus Christi–Edinburg 2008, pet. ref'd) (holding that where the defendant "did not establish that [the officer] intentionally, knowingly, or recklessly made a false statement in his

---

[4]Rotter did cite one other exchange, but we disagree that Detective Potts admitted to writing a falsity in his affidavit. During cross-examination after the *Franks* hearing, Rotter's counsel asked, "So you're doing an end around into the system by putting -- the magistrate does not get any other information than what you put into the affidavit, right?" Detective Potts responded to the rephrased question, "Correct." From a sterile reporter's record, evidencing a pause and shift in questioning, we cannot ascertain the real-time gap between the rephrasing of this question. But during the *Franks* hearing, Rotter offered no evidence that Detective Potts was pulling "an end around the system" by writing that a homicide had occurred when allegedly the officers had believed only that a suicide had occurred. Because the trial court was able to observe this complained-of exchange in person and to judge the witness's credibility, absent any evidence to the contrary, we defer to the trial court's implied finding that Detective Potts did not intentionally, knowingly, or recklessly make a false statement in the affidavit. *See Johnson*, 68 S.W.3d at 652–53.

warrant affidavit," the trial court did not err in denying his *Franks* claim). We overrule Rotter's first point.

## B. Rotter's statements after he requested a lawyer

We next turn to Rotter's complaint in his second point that the trial court erred by failing to suppress statements and evidence obtained after Rotter requested a lawyer during police questioning.

### 1. Standard of review

Custody is a mixed question of law and fact that does not turn on credibility and demeanor unless the witnesses' testimony, if believed, would always decide the custody question. *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021) (citing *State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim. App. 2013)). We apply a bifurcated standard of review, giving almost total deference to the trial court's factual assessment of the circumstances surrounding the questioning and reviewing de novo the ultimate legal determination of whether the person was in custody under those circumstances. *Id.*; *Martinez*, 570 S.W.3d at 281.

Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281.

13

When a trial court denies a motion to suppress without entering findings of fact, we view the evidence in the light most favorable to the ruling and assume the trial court made implicit findings of fact that support its ruling as long as the record supports those findings. *Wexler*, 625 S.W.3d at 167. The prevailing party in the trial court "is afforded the strongest legitimate view of the evidence, and all reasonable inferences that may be drawn from that evidence." *Id.* (citing *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)).

## 2. Law applicable to custodial interrogations

*Miranda v. Arizona* protects an individual's right to consult an attorney during a custodial interrogation, 384 U.S. 436, 471–72, 86 S. Ct. 1602, 1626–27 (1966), and it is the defendant's initial burden to establish that his statements were the product of a custodial interrogation, *Wexler*, 625 S.W.3d at 168. "Custodial interrogation" refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. An accused's statements produced by custodial interrogation are inadmissible unless the accused is first warned of his rights under *Miranda. Id.* at 479, 86 S. Ct. at 1630. Thus, an officer's obligation to give the warnings is triggered only when a person is in custody. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994). Once an individual in custody invokes his right to counsel, an "interrogation 'must cease until an attorney is present.'" *Edwards v.*

14

*Arizona*, 451 U.S. 477, 485, 101 S. Ct. 1880, 1885 (1981) (quoting *Miranda*, 384 U.S. at 474, 86 S. Ct. at 1627).

To determine whether a person is in custody, we examine all the circumstances surrounding the interrogation and resolve whether law enforcement formally arrested the person or, alternatively, restrained the person's freedom of movement to the degree associated with a formal arrest. *Stansbury*, 511 U.S. at 322, 114 S. Ct. at 1529. The ultimate inquiry is whether, given the circumstances surrounding the interrogation, a reasonable person would have felt that he was not free to leave. *Wexler*, 625 S.W.3d at 167 (first citing *Stansbury*, 511 U.S. at 322, 114 S. Ct. at 1528; and then citing *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996)). The "reasonable person" standard presupposes an innocent person. *Id.*

> There are four general situations that may constitute custody:
>
> (1) the suspect is physically deprived of his freedom of action in any significant way, (2) a law enforcement officer tells the suspect that he cannot leave, (3) law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, or (4) there is probable cause to arrest, and law enforcement officers do not tell the suspect that he is free to leave.

*Id.* at 167–68 (cleaned up and citing *Dowthitt*, 931 S.W.2d at 255). Regarding the first three situations, the restriction upon freedom of movement must amount to the degree associated with an arrest, not merely an investigative detention. *Id.* at 168. For example, a driver who has been temporarily detained pursuant to a traffic stop is not in custody for purposes of *Miranda*. *Campbell v. State*, 325 S.W.3d 223, 233 (Tex.

App.—Fort Worth 2010, no pet.) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 3150 (1984)).

Regarding the fourth situation, the officer's knowledge of probable cause must be manifested to the suspect. *Wexler*, 625 S.W.3d at 168. But this does not automatically establish custody; custody is established only if the manifestation of probable cause combined with other circumstances would lead a reasonable person to believe that he is under restraint to a degree associated with an arrest. *Id.*; *Dowthitt*, 931 S.W.2d at 255.

Whether a suspect is in custody must be based entirely on objective circumstances. *Dowthitt*, 931 S.W.2d at 254. Law enforcement's subjective intent and a suspect's subjective belief are irrelevant except to the extent manifested in law-enforcement officials' words or actions. *Id.*

**3. Analysis: Rotter's statements were not taken in violation of *Miranda*.**

Rotter failed to establish that his statements were the product of a custodial interrogation. Of the four general scenarios described above that may constitute custody, the first, second, and fourth do not apply to the facts of this case. *See Wexler*, 625 S.W.3d at 167–68. Rotter points to no evidence that anyone physically deprived him of his freedom of action in any way, told him he could not leave, or ever communicated to him that law enforcement had probable cause to arrest him.[5] In

_____

[5]The record does show that while detectives interviewed Rotter at the station, other officers were working on obtaining a search warrant. Although the police

16

fact, Rotter was not arrested or even handcuffed on the night of Hartman's death, and no officer told Rotter that he could not leave the scene.

In his appellate brief, Rotter states that "the police [were] all around, one had an AR type weapon exposed in his hands[,] and no one told . . . Rotter that he was free to leave or that he was not in custody." In short, Rotter argues in support of the third custody scenario: that the investigating officers had created a situation that would lead a reasonable person to believe that his freedom of movement had been significantly restricted. *See id.*

But the trial court viewed the body-camera footage from two different officers and heard testimony from multiple officers in determining that Rotter had not proved that he was in custody under the third scenario. After Rotter called 911 reporting Hartman's death, police and EMTs responded. Rotter was escorted out of the house and alternated between standing and sitting in the driveway for around two hours.

Concerning whether the presence of an AR-15 was coercive (as Rotter argues on appeal), the trial court would have seen that Officer Angulo, who initially held an AR-15, quickly placed it in his car after spending around a minute standing near Rotter with it in the driveway. Off and on, Rotter freely spoke with both Sergeant

believed that they had probable cause to search Hartman's residence, they never communicated to Rotter any belief that they had probable cause to arrest him that night for Hartman's murder. After the in-station interview, the police drove Rotter to Hartman's residence, where his car was parked; gave him his keys and wallet; and watched him freely drive away. *See Wexler*, 625 S.W.3d at 168.

17

Beckwith and Officer Angulo. While Rotter was speaking with Sergeant Beckwith—around thirty minutes after Officer Angulo had taken the AR-15 to his car—Rotter said that he would like to speak with "my lawyer." The body-camera footage showed that Rotter voluntarily and conversationally engaged with Officer Angulo before and after asking for a lawyer. The mere presence of officers responding to Rotter's 911 call and the AR-15's brief presence did not create a situation that would have caused a reasonable person to believe that his freedom of movement had been significantly restricted. *See id.*

Rotter also argues in his brief that "Officer Angulo testified that when . . . Rotter requested an attorney . . . he was in custody."[6] But Officer Angulo did not so testify. The prosecutor asked Officer Angulo, "Are you aware while you were talking with Jay Rotter outside whether or not he was in custody?" Officer Angulo responded, "As far as I know, he was not in custody." When asked what he understood custody to mean, Angulo clarified, "I would say if they're under arrest, they're not free to leave."

Under cross-examination, Rotter's counsel asked whether Rotter was free to leave. Officer Angulo did not directly answer the question and stated that "[Rotter] was detained at the time." Officer Angulo's testimony, along with Sergeant Beckwith's, supports the trial court's determination that Rotter was not under arrest

---

[6]At other points in his brief, Rotter acknowledges that Officer Angulo testified that Rotter was detained.

even if he was briefly detained. *See Campbell*, 325 S.W.3d at 233 ("A person held for an investigative detention is not in custody.").

The final point Rotter makes is that "[n]ot only did . . . Rotter request an attorney but he went to the police station at the direction of the officers and was asked to give an interview yet[] not provided his *Miranda* warnings." At the outset of addressing this argument, we note that it cites not to evidence but instead to Rotter's trial counsel's argument reurging the motion to suppress. *See, e.g., Cardona v. State*, No. 02-15-00036-CR, 2015 WL 9244829, at *5 (Tex. App.—Fort Worth Dec. 17, 2015, pet. ref'd) (mem. op., not designated for publication) (explaining that counsel's statements are not evidence).

But turning to the evidence, Rotter did not show that he was in custody at the police station. The record shows that when detectives arrived at Hartman's residence, Rotter—who was clothed only in blood-soaked underwear—wanted to go inside Hartman's house to take a shower and get his cigarettes. Although the detectives would not let him go inside the house, they brought cigarettes out to Rotter and told him he could take a shower at the police station. Rotter instructed them where to get clothes, and he rode in a police truck—unhandcuffed—to the police station, where he showered, changed clothes, and agreed to sit for an interview with two detectives that lasted under an hour. The detectives did not force Rotter to go with them; Rotter went voluntarily. After the interview ended, the detectives took Rotter back to Hartman's home, and Rotter drove away.

19

The fact that detectives questioned Rotter at the police station did not, in and of itself, constitute custody. *See Dowthitt*, 931 S.W.2d at 255. Rotter was not denied a shower, change of clothes, water, his phone, or cigarettes when he was at the police station. *See Wilson v. State*, 442 S.W.3d 779, 784 (Tex. App.—Fort Worth 2014, pet. ref'd). At one point, he was left in the interview room with his phone by himself. *See id.*

Viewing the evidence in the light most favorable to the trial court's ruling, *see Wexler*, 625 S.W.3d at 167, after considering the evidence in light of the above factors, we conclude that Rotter was not in custody, and the record supports the trial court's findings, *see Wilson*, 442 S.W.3d at 784–87; *see also California v. Beheler*, 463 U.S. 1121, 1122, 103 S. Ct. 3517, 3518–19 (1983) (holding that interview was not custodial when suspect voluntarily went to the police station, gave a 30-minute interview, and was allowed to go home); *Estrada v. State*, 313 S.W.3d 274, 293 (Tex. Crim. App. 2010) (same for a five-hour interview); *Burke v. State*, No. 09-18-00297-CR, 2020 WL 355939, at *4 (Tex. App.—Beaumont Jan. 22, 2020, pet. ref'd) (mem. op., not designated for publication) (same for a one-and-a-half-hour interview). We overrule Rotter's second point.

### III. Rotter's Requested Mistrial

In his third point, Rotter complains that the trial court erred by failing to grant a mistrial after it sustained his objection to a question the State asked of Hartman's long-time friend, Christi Laviolette. We disagree.

## A. Standard of review

When a trial court denies a mistrial motion, our review is for an abuse of discretion. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). "A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Id.* (citing *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). We consider the arguments before the trial court when it denied the motion, and we view all evidence in the light most favorable to that ruling. *See id.* A trial court abuses its discretion if its ruling falls outside the zone of reasonable disagreement. *Id.*

## B. The objected-to question

Laviolette testified that throughout 2020, she regularly communicated with Hartman, and sometimes Rotter, through group Zoom calls. They were on such a call the night before Hartman died. Laviolette recalled that Rotter "was talking funny" and could not "keep a straight thought." At one point, Rotter became angry and cursed at Laviolette. She thought his behavior was concerning, and she testified, "There were a lot of red flags." When she learned of Hartman's death, Laviolette immediately suspected Rotter "[b]ecause of the night before[,]" and she described why she did not think Hartman had died from suicide.

> During redirect examination, the following exchange occurred:
>
> [PROSECUTOR]. You were asked by the Defense about you knowing enough about . . . Rotter to come to your conclusions. Do you remember those questions?
>
> A. Mm-hmm.

[PROSECUTOR]. Are there things that you know about [Rotter] from your conversations with [Hartman] and your involvement in that group and your Zoom calls, additional Zoom calls with [Rotter], that you have not been able to tell this jury?

Rotter immediately objected, and the jury was excused from the court room. The trial court sustained Rotter's objection and disapproved of the prosecutor's phrasing, which had alluded to things the witness was not permitted to discuss before the jury. Rotter asked for an instruction to disregard, which the trial court said it would give, and a mistrial, which the trial court denied. When the jury returned fifteen minutes later, the trial court instructed them as follows: "Ladies and gentlemen of the jury, you are instructed to disregard the last question of this witness." Then, without asking any more questions, the State passed the witness.

## C. Analysis: The trial court properly denied the requested mistrial.

Assuming that the prosecutor's question was improper, we examine whether it was harmful. *See Hawkins*, 135 S.W.3d at 77 (stating that whether a trial court abuses its discretion in denying a mistrial involves most, if not all, of the same considerations that attend a harm analysis). We apply the three-factor harmless-error test to determine whether a trial court abused its discretion in denying a motion for mistrial due to prosecutorial misconduct, examining (1) the severity of misconduct, (2) any curative measures, and (3) the certainty of the conviction. *See, e.g., Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2007) (addressing improper argument); *Ramon v. State*, 159 S.W.3d 927, 929–32 (Tex. Crim. App. 2004) (involving prosecutorial

22

testimony); *Harper v. State*, 508 S.W.3d 461, 470 (Tex. App.—Fort Worth 2015, pet. ref'd) (stating that the test applies to an improper question). Applying these factors, we hold that the trial court did not abuse its discretion in denying Rotter's mistrial motion.

### 1. Severity of the misconduct

Rotter argues that the State's question "posed the risk that the jurors would believe there was some hidden evidence about [him]" and asserts that he "was prejudiced by even the implication that something was being held back from the jury at someone's instruction." In considering the severity of an alleged improper question, we focus on the misconduct's prejudicial effect. *See Hawkins*, 135 S.W.3d at 77. We consider whether the prosecutor's question was clearly calculated to inflame the jurors' minds and was of such a character as to suggest that withdrawing the impression was impossible. *Harper*, 508 S.W.3d at 470 (citing *Gonzalez v. State*, 685 S.W.2d 47, 49 (Tex. Crim. App. 1985)). A mistrial is warranted only if the question was obviously harmful to the defendant, *id.*, and it was not in this case.

Here, the prosecutor's question to Laviolette did not directly allude to any specific improper or inadmissible evidence that was held back from the jury.[7] And to the extent the question indirectly or vaguely referenced information not known to the

---

[7]In support of his prejudice argument, Rotter cites *Griggs v. State*, which is factually distinguishable. 213 S.W.3d 923, 924–26 (Tex. Crim. App. 2007). Unlike this case, multiple witnesses in *Griggs* repeatedly testified about a criminal defendant's inadmissible extraneous offenses. *Id.* at 926–27.

jury, the phrasing of the question had only a minimal, if any, prejudicial effect. *See Rideaux v. State*, 498 S.W.3d 634, 640 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (concluding that prosecutor's question's phrasing that defendant had "done this before" had a minimal prejudicial effect because it was brief and was not emphasized).

Indeed, the question is similar to the one in *West v. State* that we concluded was not clearly calculated to inflame jurors' minds or otherwise obviously harmful. No. 02-18-00109-CR, 2019 WL 3491937, at *2–3 (Tex. App.—Fort Worth Aug. 1, 2019, no pet.) (mem. op., not designated for publication). In *West*, the prosecutor asked, "Other than the agreed-upon edits by defense counsel and counsel for the State of inadmissible material, has that [video evidence] been edited in any way to your knowledge?" *Id.* at *1 (footnote omitted). We held that the prosecutor's question directly referencing "inadmissible material"—that is, part of a video that could not be shown to the jury—was not clearly calculated to inflame the jury. *Id.* at *3. Similarly, we conclude that the prosecutor's question in this case referencing things Laviolette "[had] not been able to tell this jury" was not clearly calculated to inflame the jury. *See id.*

### 2. Curative measures

Generally, "a prompt instruction to disregard will cure error associated with an improper question and answer." *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). Here, the question did not actually expose or identify to the jury any inadmissible or improper evidence. As in *West*, any error in the prosecutor's question

24

alluding to inadmissible evidence was curable by prompt instruction. *See* 2019 WL 3491937, at *3–4. The jury was given a 15-minute break immediately after the trial court sustained the objection to the question at issue. When the jury returned, the trial court immediately instructed the jury "to disregard the last question of this witness." We presume that the jury followed the trial court's instructions, and Rotter has not identified evidence to the contrary. *See Thompson v. State*, No. 02-18-00084-CR, 2019 WL 3819265, at *10 (Tex. App.—Fort Worth Aug. 15, 2019, no pet.) (mem. op., not designated for publication) (citing *Jenkins v. State*, 493 S.W.3d 583, 616 (Tex. Crim. App. 2016)).

### 3. Certainty of conviction

The third factor assesses the likelihood that Rotter would have been convicted without the misconduct. *See Ramon*, 159 S.W.3d at 931. Strong evidence against an appellant undermines an argument for abuse of discretion. *See id.* at 931–32 (weighing eyewitness testimony and DNA evidence in affirming denied mistrial motion).

We begin our analysis considering that Rotter has not challenged on appeal the sufficiency of the evidence against him. And the evidence supporting Rotter's conviction is compelling. Among other things, the jury heard from multiple witnesses about Hartman's state of mind on the night she died—that she was not suicidal—and about Rotter's aggressive and disturbing behavior the night before Hartman's death. Additionally, the jury saw Rotter's Discord chat log showing him with his handgun at 11:08 p.m. and the message that he "just sent a 9 millie in this fuckin hippy" at

11:13 p.m. The jury was able to watch video of Rotter's interactions with police, including the police interview at the station, as well as his erasing his phone's contents. The jury also had evidence that Rotter's gun was used in Hartman's death and gunshot residue was on his hands but not on hers. In short, the evidence's cumulative weight supports the jury's still convicting Rotter even without the prosecutor's objected-to question to Laviolette. *See West*, 2019 WL 3491937, at *4.

### 4. Weighing the factors

As we stated in *West*, "In weighing these three factors, we are reminded that '[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.'" *Id.* (quoting *U.S. v. Young*, 470 U.S. 1, 11, 105 S. Ct. 1038, 1044 (1985)). Given the challenged question's brief, nondescript, and non-emphasized nature; the trial court's instruction to disregard; and the cumulative evidence against Rotter, we hold (assuming the question's impropriety) that the trial court's ruling was within the zone of reasonable disagreement, and none of the factors weigh in Rotter's favor. *See id.* Accordingly, the trial court did not abuse its discretion by denying Rotter's mistrial motion, and we overrule his third point.

## IV. Conclusion

Having overruled Rotter's three points, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  March 27, 2025